UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NOVI PROMENADE ASSOCIATES
LIMITED PARTNERSHIP, and
LANDON DEVELOPMENT CORP.,

      Plaintiffs/Counter Defendants,

                            Case No. 02-CV-72890

vs.                           HON. GEORGE CARAM STEEH

TARGET CORPORATION,

      Defendant/Counter Plaintiff.
_____/

<u>OPINION AND ORDER OF THE COURT FOLLOWING BENCH TRIAL</u>

<u>I.  Overview and Procedural Background</u>

      The crux of this lawsuit, removed to this court from state court on the basis of

diversity of jurisdiction, is the parties' dispute over their contractual obligations relating

to the site development for a Novi, Michigan Target store that opened in October 2002.

Essentially, the developer/landowner plaintiffs seek this court's determination that

Target improperly took over the site development from plaintiffs, while defendant Target

asks that the court find that Target followed the parties' agreement, which allowed for

take over of site development only if Target reasonably believed, in good faith, that the

parties' schedule was not being met.  The claims tried by the parties were the parties'

cross-claims for breach of contract, as well as plaintiffs' claim alleging trespass, and

Target's counterclaim alleging unjust enrichment.

This matter has been pending in this court for little over three years, and the court has had opportunity to rule on a number of pre-trial matters, including the parties' cross-motions for summary judgment, and preside over a lengthy bench trial, at which the parties cumulatively presented hundreds of exhibits.  Following the bench trial, for which the parties prepared trial briefs, proposed findings of fact and conclusions of law, post-trial briefs, and limited supplemental briefings, the parties presented oral closing arguments on June 22, 2005.  The matter was ripe for decision as of that time.[1][2]

After considering all of the written and oral argument, as well as the physical and testimonial evidence, the court herein issues its findings of fact and conclusions of law, pursuant to Fed. R. Civ. P. 52, as set forth below.  Although all of the materials and evidence contribute to the court's findings in this matter, due to the bulk of evidence, the court's written determinations can incorporate only a portion of the parties' evidence and argument.

II. Findings of Fact

It is undisputed that a new Target retail store located in the southeast quadrant of the intersection of Wixom Road and Grand River Avenue in Novi, Michigan (the "Target store"), was completed and opened for business in October 2002.  At trial, the parties

---

[1] The court notes that neither certain claims contained in plaintiffs' amended complaint nor certain counts contained in Target's third amended counterclaim were addressed as part of the bench trial.  It is the court's opinion that all claims remaining are rendered moot or unnecessary as a consequence of this opinion and order.  If necessary, the court would entertain a motion to reopen the case to address any unresolved claims.

[2] Also requiring disposition on the docket of this matter is Target's motion in limine concerning the report of Matt Diffin, filed January 28, 2005.  That motion was DENIED, as stated on the record on February 4, 2005, for the reasons there given.

2

offered a great deal of evidence concerning their relationship, negotiations, agreements, and disputes during the months–and years--prior to the store's opening.  Again, in the parties' post-trial summaries and argument, the pre-development relationship is hashed out in great detail, most, if not all, of which the court finds unnecessary to decide this case. The court's factual findings as to the pertinent interaction between the parties to this case follows.

It was established at trial that at the beginning of the parties' relationship, an affiliate of Landon Development Company, a Michigan corporation, owned approximately 45 acres of land in Novi, Michigan, concerning which the affiliate had sued the city of Novi in state court, seeking the right to develop the property.  Prior to resolution of that suit via a consent judgment issued July 19, 2001 (the "Consent Judgment"), a letter of intent ("LOI") concerning the Target anchor store was signed by Landon and Target.  That LOI was signed May 30, 2001, the day Landon representatives met with Target representatives in Minneapolis, Minnesota at a Target "Capital Project Request" ("CPR") meeting during which they discussed the project.[3] The LOI stated the general economic terms of the transaction, contemplating that the developer would prepare the pad on which the Target store would be built, and perform other general site work including roads, utilities, parking lots, and landscaping, and stated that the "[d]eveloper shall use best efforts to commence the grading of the Target

_____

[3] As referenced above, a great deal of evidence was offered at trial concerning the details of the parties' relationship from late 1999 until that meeting, which the court finds unnecessary to discuss in making a determination on the parties' claims.  Specifically, much of the evidence offered by plaintiffs concerns the decision making concerning an opening date for the Target store, which, for the reasons set forth below, does not impact the court's decision.

property by August 15, 2001 and deliver the Target pad on or before December 1, 2001." Plaintiffs' Exhibit 12, ¶ 9. The "CPR Book" discussed at the meeting incorporated a model schedule reflecting an October 2002 opening, and a requirement of an October 2002 opening was discussed at the meeting. Plaintiffs' Exhibit 38, Trial Testimony of Landon representative Thomas High, Volume 3, p. 15.

The Consent Judgment, issued some weeks later, allowed for grading of the shopping center parcel subject to submission of a mass grading plan, but required Landon to obtain preliminary site plan approval prior to starting work on the building pad for the Target store, and final site plan approval prior to installation of site utilities and other site improvements. Defendant's Exhibit 11, ¶ 6.

Between July 19, 2001 and December 2001, the parties were in communication regarding Landon's progress with the permitting process and certain terms of the agreement. Ultimately, all involved came to realize and accept that site plan approval would not be forthcoming in the time frame discussed earlier in the year. Nonetheless, it is the court's finding that none of the communication referenced showed an agreement to change the October 2002 opening date, and both parties recognized there would be a date some days or weeks prior to the opening at which all work had to be completed, in order to obtain an occupancy permit from Novi. Although Landon has certainly pointed to evidence showing discomfort on the plaintiffs' part with the October 2002 date, it is abundantly clear that Landon nonetheless made the decision to go forward with the deal with that date unchanged. For instance, as discussed by Target in its Post-Trial Brief, pp. 31-32, notes of Target representative Mr. Struve summarize a conversation between the parties discussing the number of weeks necessary from the

4

February 1 proposed pad delivery date to create a building ready for installation of fixtures; also and a note from Mr. High to Mr. D'Amico, who was then expected to be the contractor on the site, circulating a proposed modification to the schedule in Exhibit C to be attached to the Site Development Agreement with the October store opening date. Defendant's Exhibit 68.  In fact, those notes stated the schedule modified an earlier one, and further that "[t]his is the schedule that needs to be adhered to by Target.  Most of the dates have moved up only slightly, however items C, D & E are up 1 month and E is up 2 months.  We must do this."  Id.  However, the court also credits the testimony of Tom High concerning conversations High had with Dean Zurmely of Target, in which Zurmely indicated the dates could be moved if necessary.  See, e.g., Trial Testimony of Tom High, 2/2/05, pp. 49-50.  The court, however, does not accept High's testimony to the effect that Target agreed the store opening date could be changed.  In fact, Mr. Zurmely himself admitted the only real critical date in the schedule was the turnover date, to allow for opening the store on time.

Although final site plan approval had not yet been secured during the month of December 2001, the parties were working on finalizing the terms of the three separate agreements, ultimately signed in January: the Site Development Agreement ("SDA"), a Purchase Agreement, and an Operations and Easement Agreement ("OEA").  In that December time frame, Landon requested payment of an additional $455,000, reflecting Landon's estimated cost for imported fill to complete the pad on schedule (i.e. in the winter), to which Target would not agree.  However, the agreements as signed did reflect certain changes in the economic deal of the parties.  For example, because Target did not want to close on its portion of the shopping center property prior to

5

plaintiffs' receipt of final site plan approval, yet site development had to begin to make an October 2002 store opening date possible, the parties agreed to the following: Target would make an immediate payment to Landon of $150,000, to facilitate Landon's site work. Target would close on the property so long as plaintiffs obtained final site plan approval by April 30, 2002. If Target refused to close despite the site plan approval, Landon would receive $1,000,000 in liquidated damages, against which the $150,000 would serve as a credit for Target. The remaining terms were, largely, what had been planned by the parties. Under the SDA, Target would pay plaintiffs $3.45 million for the 13.23 acre site for its store. Target further agreed to pay $1.9 million for the development and improvement of the site; the balance of the development expenses would be borne by Landon. Landon agreed to develop and improve the site as required by the City of Novi for Target to obtain its certificate of occupancy by October 2002. The Purchase Agreement, Site Development, and Operations and Easement Agreement documents were signed by Target and Landon on January 11, 2002. The SDA and OEA were placed in escrow on January 22, 2002, with an escrow closing planned, to take place once site plan approval had been obtained. The SDA's attachments included an Exhibit C, which outlined deadlines for the site work.[4]

Closing occurred on April 19, 2002. Target then paid Landon $3.45 million, and made payments toward its $1.9 million contribution to the sitework under the SDA. Between the document signing and the final site approval, preliminary work on the

---

[4] Most notable, perhaps, was that the pad delivery date given on Exhibit C was February 1, 2002, just days after the placement of the documents in escrow. In any event, the SDA did not become effective until April, 2002.

6

Target pad was performed by Landon's contractor, ET MacKenzie.  The pad is the
ground beneath the store itself, which is manipulated and compacted to support the
weight of the building.  Landon points out that weather caused significant delays in the
pad construction, and that MacKenzie had to repeatedly manipulate the fill to reach the
required compaction standard, which was ultimately lowered by Target to facilitate
progress on the pad.  The parties worked out an arrangement to allow Target to begin
building construction before the entire pad was complete, and the first half of the pad
was delivered to Target on April 18, 2002.  About this time, the Operating Engineers
union began picketing at the site, due to MacKenzie's presence as a non-union
contractor.  The court notes that this union problem required attention to resolve, and
may have caused some delay just as the pad was being turned over to Target.  Another
cause of delay was the bidding process for site work, undertaken by Landon
representative Brian McCafferty.  As quoted in Target's post-trial brief, the court noted
Mr. McCafferty's difficulty with the bidding process, and the these inefficiencies led to a
decision to bring Bartow & King on board as a project manager:

> The Court:    And in relation to the rounds of biddings that you described,
> the first being around mid April, the second being around
> April 24th, and the third one being in May, at what point
> during the solicitation and the receipt of those bids did you
> have the idea of hiring Bartow & King?
> A:    I'm pretty sure, Your Honor, that I began–that I got the ball
> rolling on the potential of a [construction manager], you
> know, talking with Carolyn and maybe even Dan, I'm pretty
> confident I got that ball rolling much earlier like in April when
> I got the first nightmare, and I'm like wow.
> The Court:    By "first nightmare" you are referring to-
> A:    The first nightmare of bids that was just so, you know, far
> away from each other.

7

Trial Testimony of Brian McCafferty, 2/3/05, pp. 109-110.  The pad was ultimately completed by MacKenzie on Friday, April 26, after which Target's contractor, Conlon, placed stone on the pad over the weekend.  The court agrees with Landon that this represented Target's acceptance of the pad.  Contrary to Target's claims at trial, by its actions it abandoned any right to expect formal certification of the finished pad.

At this point, Landon had the responsibility for the remaining site work it had agreed to in the SDA.  While some of the work had been accomplished by the end of April, after final site approval was granted, Landon had to seek bids for the remainder.  As this process was beginning, Landon made an agreement with MacKenzie to install the storm sewer and fire loop, both of which were necessary before Target could begin "vertical construction" of its store.  The parties dispute the cause of delays in the start of this particular work, Landon asserting Target's concern about bringing non-union workers back to the site, and Target asserting Landon caused the delays.  In any event, this problem was averted when the Fire Marshal allowed vertical construction to overlap installation of the fire loop.  See Trial Testimony of Allan Nagorzanski, 2/10/05, pp. 45-47.  The court thus credits the testimony of plaintiff's expert and finds that this particular issue did not present any serious obstacle to Target completing its work on time.

Brian McCafferty, Landon's on-site representative, testified that he planned to award the remainder of Landon's site work to MacKenzie by late May.  However, this again caused a threat by the union, and caused McCafferty to instruct project manager Bartow & King to rebid the work and give Landon its recommendation by the beginning of June.  Meanwhile, Target's in-house counsel, Jane Borden, prepared and sent a letter dated May 28, 2002 stating that Target intended to take over the site work, in part

8

due to Landon's failure to meet a number of dates in the schedule, i.e. Exhibit C to the

SDA, as contemplated by section 6(a) of the SDA.[5]

Section 6 of the SDA provides for Target's takeover of the sitework if Landon

does not meet dates set forth in the "Master Schedule." In the event that Target takes

over sitework, Landon remains liable for "Developer's Costs," which includes all of the

sitework costs, related permits and related costs, less Target's $1.9 million Site

Improvement Fee, for which Target remains responsible.

The May 28, 2002 letter required that Landon send an updated schedule, as

contemplated by the SDA, to demonstrate that the site work could be completed as set

forth in the SDA. Within several business days, Steve O'Mara of Bartow & King sent a

revised schedule, indicating the work could be completed in time for the October 2002

store opening. In the meantime, Target representatives had begun talking to Landon's

prospective subcontractors about the possibility of Target taking over the site

development work. A meeting was held on site on June 13, 2002, and testimony at trial

showed that Target agreed that the dates provided by Landon could allow an October

2002 store opening. However, the Landon schedule included certain footnotes allowing

Landon extra time in the event of rain or utility delays. It became clear to the court at

trial that it was these footnotes that prevented the parties from agreeing that Landon

would complete the site development work, largely because Target representatives had

simply lost confidence in Landon's ability and commitment to finish its work on time.

Target would not agree to keep the status quo with the footnotes, and Landon would not

---

[5] The SDA, with an effective date of April 19, 2002, was admitted into evidence as a part of Plaintiff's Exhibit 1, the "Closing Binder."

agree to remove the footnotes.  Although Target argued at trial that the Landon proposed schedule also failed to address certain tasks at all, this complaint was never even addressed at the meeting and Landon was never given an opportunity, therefore, to supply these dates.

At the conclusion of the meeting, outside counsel for Landon, Harold Fried, asserted to Target that Landon could not properly take over the site work.  However, Fried stated that if Target were nonetheless going to take over the work, Target could use Landon's site drawings and permits.  Several days later, Fried sent Target a draft amendment to the SDA permitting such a takeover under certain conditions.  Target never responded to the proposal.

Ultimately, Target did take over the remaining site work, bringing on Landon contractor Bartow & King/Steve O'Mara and contracting (through its prime contractor, Conlon Construction) with Landon subcontractor MVA to complete the work.

III.  Analysis/Conclusions of Law[6]

a.  The Parties' Respective Breach of Contract Claims

To establish a breach of contract under Michigan law, it must first be established that the contract is valid, which the parties do not dispute in this matter.  To establish a breach of that contract, the party seeking to recover on that basis must prove, by a preponderance of the evidence, what were the terms of the contract, that the other party breached those terms, and that the breach caused injury to the claimant.  In re Brown,

---

[6] To the extent this section of the opinion discusses facts or makes inferences not set forth in the "Findings of Fact" section, above, such facts or inferences are incorporated therein.

10

342, F.3d 620, 628 (6th Cir. 2002), citing <u>Platsis v. E.F. Hutton & Co., Inc.</u>, 642 F.Supp.

1277, 1309 (W.D. Mich. 1986).

Both plaintiffs and defendant strenuously argue that the other party/ies breached

the SDA.  Much of the argument concerns whether Target, "in its reasonable judgment

and in good faith," took over the site development work.  After prolonged consideration

of the evidence and arguments made by the parties, the court has determined that both

parties committed breaches, although not in Landon's alleged failure to meet dates nor

in Target's takeover of the work.  For the reasons that follow, it is the court's

determination that the parties' breaches were in Target's failure to pay Landon for its

Site Development Fee, portions of which were invoiced to Target in June and July 2002,

and in Landon's failure to pay Target Developer's Costs.

Section 6(A) of the Site Development Agreement reads as follows:

Section 6.  <u>Take Over by Target; Reimbursement Rights</u>

If Target determines in its reasonable judgment and in good faith that the
performance of the Site Improvement Work is not in accordance with the
Site Construction Documents and/or is not proceeding so as to be
completed within the Master Schedule (it being understood that time is of
the essence), Target may give notice of such fact to Developer.  If
Developer does not present to Target reasonable evidence, within ten (10)
days of receipt of such notice, either that the work will be completed as
required or that an extension of a completion date is permitted under the
terms of Section 10 below, Target shall have the right, but not the
obligation, to assume control of the construction of all or any designated
portion of the Site Improvement Work located on or necessary to operate
the Target Tract and the Permanent Access Drive and which are required
in order to obtain the occupancy permit for the Target Building, and upon
such election Target agrees to proceed to complete the same with all
reasonable dispatch.  Target shall have no right to modify the Site
Construction Documents in order to complete the portion of the Site
Improvement Work over which Target has assumed control so as to
accommodate Target's need to open on schedule.  Developer hereby
grants to Target, its contractors, agents and employees a temporary

11

license to enter upon the Developer Tract for the purpose of performing all
or any part of such construction work.  Target shall remain liable for
Developer's Costs and agrees to periodically pay Developer's Costs to
Target in the same manner as set forth for payment by Target in Section 5
above.  If Developer fails to pay Developer's Costs when due under this
Section 6(A) and if Target so performs construction work and if a portion
of Developer's Costs with respect to such work are reimbursable by third
parties, Developer hereby assigns to Target its rights to collect such
reimbursement.  In such event, Developer agrees to execute and deliver
to Target any documents required to further evidence such assignment.
Upon such assignment, Developer consents to Target seeking and
obtaining, at Target's option, recovery of such reimbursements provided
any funds actually obtained by Target, net of Target's reasonable costs in
obtaining the funds, shall be applied to Developer's Costs.

Site Development Agreement, § 6(A).  The definition of "Master Schedule" is found in §

4(C) of the SDA, in which it states that, four weeks prior to beginning the Site

Improvement Work, Developer must submit a bar chart conforming with the Schedule

set forth on Exhibit C, and the bar chart together with the Schedule will be considered

the "Master Schedule[7]."

As discussed in the court's ruling on the parties' cross-motions for summary

judgment:

The terms of the contract obligating plaintiff to make Developer's Costs
payments contemplate a takeover only after Target's determination "in its
reasonable judgment and in good faith that the performance of the Site
Improvement Work is not in accordance with the Site Construction
Documents and/or is not proceeding as to be completed within the Master
Schedule."  SDA, section 6(A).

Clearly, there was no "Master Schedule," which is defined in the SDA to be the

schedule attached thereto along with a bar chart to be provided prior to commencement

---

[7]  As noted in its ruling on summary judgment, the court again notes that there is no
evidence that plaintiffs provided defendant with a bar chart as set forth in section 4 of the
SDA, which would have addressed details of the development project not mentioned in
Schedule C.

12

of Landon's site work under the SDA.  There was no evidence offered by Landon that it prepared or exchanged such a document, and none by Target to show that it demanded production of such a document.  Furthermore, the court finds that by its terms, the SDA itself became effective only after coming out of escrow, which was long after several dates in Exhibit C had already passed and had not been met.  The actions of the parties demonstrated clearly to the court a waiver, or disregard, of a *particular* schedule.  The parties' actions demonstrated that they were focused solely on getting the work done to open the Target store in October.  As set forth above, the court has credited the testimony of Tom High concerning Target's willingness to change dates, and that the signing of the contract "as is" was a technicality, simply done to get the deal moving and open the store in October.  Despite Target's assertion that it repeatedly asked Landon for a schedule such as that contemplated in section 4(c) of the SDA, Target continued working with Landon, and did not insist on the preparation of a Master Schedule.  Thus, the "Master Schedule" became only the very end dates set out in Exhibit C.

Although the court finds that most of the specific dates given in the SDA were not set in stone, the court also finds that Target reasonably feared that the project's progress (or lack thereof) was not going to allow its October 2002 store opening.  Likewise, the court finds that the letter, notifying Landon of Target's intention, was sent in good faith.  Although the face of the document may have included a partially nonsensical rationale, given the parties' mutual waiver of many dates in Exhibit C to the SDA, the letter was written by a corporate attorney without knowledge of the physical operation of the project.  The May 28, 2002 letter merely served to give Landon notice of Target's intention to take over the project, to which Landon was able to respond.  The

13

court credits the testimony of all involved at the resulting June 13, 2002 meeting, to the effect that the meeting was a serious effort to resolve the dispute.[8]  The court's findings, above, indicated that Landon's effort to restore the status quo failed due to its insistence on footnotes granting it extra days for rain delays or utility problems.  Although Landon asserts that such footnotes were merely a reiteration of a Force Majeure clause already part of the SDA, such that Target's refusal to accept the footnotes demonstrated that Target's takeover was in bad faith, the court finds Target's discomfort with Landon's commitment and ability to complete its work prior to the opening date was reasonable.

As to Landon's complaint that Target breached its duties by contacting potential subcontractors, thereby preventing Landon's completion of the bidding process, the court acknowledges that the contacts by Target impaired Landon's ability to successfully bid the work but did not preclude it.  Moreover, the contacts by Target were reasonable in light of the court's conclusion that Target had a reasonable apprehension of failure by Landon to complete its work on time.

As indicated above, the court also disagrees with Landon's argument concerning the appropriate findings resulting from the meeting.  It is the court's finding that as of June 13, 2002, Target was on the brink of failing to get its store open on time.  Target had made a contract designed to ensure the store would open on time, a fact Target representatives at trial confirmed is of great importance to Target.  It was a fact well known and understood by the plaintiffs.  By definition, Landon could not have had the

---

[8]  The court notes that the number of representatives at the meeting on behalf of both Target and Landon supports the serious nature of the discussions; had Target been undertaking the takeover in bad faith, it likely would not have been represented in such force.

same interest in the store's opening in October 2002.  Moreover, Landon had demonstrated some frustration with securing bids for the site development work, as reflected by Brian McCafferty's testimony upon questioning by the court, set forth above, which had not yet been resolved at the time Target took over the work.

For the reasons set forth above, Target will not prevail on its breach of contract claims to the extent those claims assert Landon's breach on the basis of untimely Site Development Work.  Likewise, Landon will not prevail on its breach of contract claim to the extent the claim asserts Target's unreasonable or bad faith determination to take over the work.  Target was in a situation where, the court finds, it was reasonable to believe the store's opening date was in jeopardy, and the only way to guarantee an on-time opening was to undertake the work itself.  Therefore, the court finds that Target did not breach the SDA by its takeover.

The breaches that did occur under the SDA were the parties' respective refusals to make payments clearly required by the terms of §6(A), i.e. Landon's Developer's Costs and Target's Site Development Fee.  The court is persuaded that each of the parties has proved, by a preponderance of the evidence, that the other was responsible for these certain payments, that the other party breached those terms, and that the breach caused injury to the claimant.  Moreover, the court cannot find that either breach would be material, i.e. excusing the other party's performance under the contract.  The rule of law in Michigan provides that the party "who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."  Michaels v. Amway Corp., 206 Mich.App. 644, 650, (1994), quoting Flamm v. Scherer, 40 Mich.App. 1, 8-9 (1972).  However, it must be a substantial first

15

breach for the rule to excuse subsequent performance.  Id., citing Baith v. Knapp-Stiles, Inc., 380 Mich. 119, 126 (1968).  In the instant case, Target's failure to pay the invoices representing Landon's third and fourth draw on Target's capped $1.9 million Site Improvement Fee is not material in light of the fact that Target took over the work and could anticipate a significant increase of expenses formerly allocated to Landon.   A discussion of particular damages follows.

As damages resulting from Target's breach of contract, Landon claims entitlement to payment for its third and fourth draw requests presented to Target after the May 28th letter, in an amount totaling $413,359.81 and unpaid by Target.  The court finds that this is Landon's injury resulting from Target's breach and that an award of this amount is appropriate in connection with its judgment for Landon on this claim.[9]

Target, on the other hand, asserted at trial and in its post-trial brief that it has paid a total of $5,159,761 toward the site improvement work, $3,259,761 more than its agreed-upon $1.9 million Site Improvement Fee set forth in the SDA.

Both sides agree that following its takeover, Target had an obligation to act prudently in completing the site development work assigned to Landon under the SDA. The disputed question is whether Target, in its haste to complete the project, imprudently agreed to pay excessive sums to contractors in order to meet its schedule. Specifically, Landon asserts Conlon approved change orders to its contract with site development contractor MVA that would not have been approved had Landon had control of the work, totaling $498,476.55, left unsuitable soils on Landon/Novi

_____

[9] However, as discussed below, this amount will serve as an offset to the judgment entered for Target, and is accounted for by Target's own calculation of damages sought.

16

Promenade property that Landon would not have allowed to be left, and paid MVA for certain road work Landon will have to redo, at a cost of $56,264.

Concerning the road work, Landon is unable to demonstrate damages in any amount. It has incurred no repair expenses to date, it sought no repairs during the warranty period, if any, and it is apparent that the road will now be replaced in connection with the development of a WalMart. Turning to Landon's assertion about the unsuitable soils left on the parcel, Landon complains that Target imported large quantities of stone unnecessarily at a significantly higher price than necessary or prudent to construct site improvements, rather than to use less expensive sand, including on-site materials. The court agrees with Target that its approach to the road, parking lot, and pad stabilization was all commercially reasonable, including leaving the "unsuitable" soils on the property, and no damages due as an offset to Landon will be awarded to Landon as a result.

Finally, the court will address the change orders Conlon made to its contract with MVA, asserted by Landon to be unreasonable. As a general proposition, Landon complains that Target unreasonably spent too much as a result of its bad faith decisions in completing the improvements. Landon attempts to establish the difference between bids it received for work against the contracts entered into by Target as the measure of unreasonable overpayment. This attempt fails in most respects. First, the bids Landon had received were not accepted and were subject to revision to better define the scope of work. Second, the changes necessary following Target's takeover would have necessitated most of the change orders and modifications ultimately agreed to by Target. For example, the use of limestone instead of sand or clay was a reasonable

17

choice given the economics and reasons advanced by Target, contrary to the testimony of Mr. Diffin at trial.

Two exceptions to this general finding, where the court agrees with Landon, relate to the additional charges paid by MVA in relation to its October 1, 2002 repricing of storm work (Target's Exhibit 443) and its payment of $59,915 in overtime.  The court is persuaded that Target acted unreasonably in approving both of these items.  The storm work was grossly overcharged, resulting in overpayment of $5,621.00, and the agreement to pay overtime was an unreasonable overpayment because Target failed to demonstrate the necessity of its agreement to pay overtime in order to complete the work on time.  Indeed, the testimony of Mr. Peterson and others persuades the court that it was commercially unreasonable to agree to pay overtime.

For the foregoing reasons, the court has determined that an award of the total site work costs incurred by Target of $3,070,114, as represented in Target's Exhibit 549, less the above, unreasonable overpayments to MVA, of $65,536, for a judgment amount of $3,004,578, is appropriate.  Because the total sitework costs have already been calculated by Target as a net after deducting Target's contractual $1.9 million contribution under the SDA, the judgment for plaintiffs for the unpaid invoices has already been accounted for as an offsetting obligation.

b. Novi Promenade's Trespass Claim

Given the court's finding above, that Target did not breach the SDA by virtue of its takeover, it is clear that Target did not trespass on the property of Novi Promenade in performing the site development work.  There is no dispute that a "trespass" in Michigan requires a finding of an unauthorized entry on the land of another.  Target cites to

18

Amoco Pipeline Co. v. Herman Drainage Systems, 212 F.Supp.2d 710, 720 (W.D. Mich. 2002) (collecting earlier cases) for this proposition, with which the court agrees.  The Site Development Agreement explicitly states that where the situation arises that Target has the right:

> "to assume control of the construction of all or any designated portion of the Site Improvement Work located on or necessary to operate the Target Tract and the Permanent Access Drive and which are required in order to obtain the occupancy permit for the Target Building...Developer hereby grants to Target, its contractors, agents and employees a temporary license to enter upon the Developer Tract for the purpose of performing all or any part of such construction work."

§ 6(A), SDA.

Given the court's determination that Target's takeover was not a breach, there can be no serious contention that Target trespassed in the context of its site development work, regardless of whether the owner was Landon or Novi Promenade, both controlled by Daniel Aronoff.   The court agrees that Hunter v. Slater, 331 Mich. 1 (1951) lends support to defendant's argument.  Certainly, as in Hunter, Novi Promenade had knowledge of the site development and surrounding circumstances, and Target can be said to have relied to its detriment on the license granting access to the site.  See also Art Van Furniture, Inc. v. Detroit Edison Co., 2000 WL 33521876 (Mich.App. 2000) (unpublished).  The transfer of ownership, itself, did not impact or change the development of the parcel in question.  Moreover, Target was permitted by Landon to use its permits and plans to develop the site.  Novi Promenade thus did not establish at trial that Target's entry on the property, under these circumstances, was unauthorized, and it will not succeed on this claim.

c. Target's Unjust Enrichment Counterclaim

19

As with the trespass claim, the court's determination on the parties' respective breach of contract claims makes it unnecessary to devote much analysis to this claim. Target provides the elements of an unjust enrichment claim in its post-trial brief, not disputed by plaintiffs: 1) receipt of a benefit by the defendant from the plaintiff, and 2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. Keywell & Rosenfeld v. Bithell, 254 Mich.App. 300, 327-28 (2003).

In Target's post-trial brief, it asserts that its unjust enrichment damages "are the same as its breach of contract damages," and that Novi Promenade, the current owner of the shopping center development area, received a benefit by virtue of the site work performed by Target equal to that Landon received (i.e. the total cost of the site development work less the $1.9 million contribution required by Target under the contract). Plaintiffs' argument, in its post-trial brief, asserts that Target's "unclean hands" prevent it from recovery of unjust enrichment damages, but they do not contest the asserted amount of damages.

It is the court's finding that Target has succeeded on its unjust enrichment claim in the amount requested: i.e. the amount awarded above for Target's breach of contract counterclaim, which shall be an obligation shared jointly and severally with Landon.

d.  Attorney Fees

Both parties seek costs and attorney fees accrued during the pendency of this litigation.  The pertinent section of the SDA follows:

> Section 13.  Costs and Attorney's Fees.  If either party brings or commences any legal action or proceeding to enforce any of the terms of this Agreement (or for damages by reason of an alleged breach of this Agreement), the prevailing party in such action shall be entitled to

recovery of all costs and expenses of litigation, including reasonable
attorney's fees.

Fed. R. Civ. P. 54(d)(2)(A) states that "[c]laims for attorney's fees and related

nontaxable expenses shall be made by motion unless the substantive law governing the

action provides for the recovery of such fees as an element of damages to be proved at

trial."  In a contract action, where the contract provides for an award of attorney's fees to

the "prevailing party," such attorney fees are an element of damages, to be determined

along with the other claims in the case, not by separate motion.  Clarke v. Mindis

Metals, Inc., 99 F.3d 1138 (6th Cir. 1996) (unpublished).  As discussed in that opinion,

where the term "prevailing party" is not defined in a contractual provision, the term shall

"have the meaning given it by the case law under Fed. R. Civ. P. 54(d)(1)."  Id., 1996

WL 616677 at *9.  That case law generally states that such costs and fees may be

awarded "even when the successful party is not awarded his entire claim," see

Zackaroff v. Koch Transfer Co., 862 F.2d 1263, 1265-66 (6th Cir. 1988), but does not

address where each party is successful on certain claims, but neither is successful on

all claims.

Target's post-trial brief indicates that it will need to update its attorney fees to

date before the court can make a determination on this provision.  However, the court

will decline to award attorney fees to any party in this action, for the reasons that,

making further proffers and/or argument unnecessary.  Because the court has found for

each of the parties only on some aspects of their claims, and against each of the parties

on the bulk of their respective claims, the court finds that an award of attorney fees

under these circumstances would be inequitable.  Where each of the parties has

committed a breach, there can be no single "prevailing party."  "Prevailing party," as that term appears in the SDA, is not defined.  In light of the court's ruling, finding both plaintiffs and defendant successful on limited claims, it is the court's determination that each of the parties is a "prevailing party" to some extent.  Although the respective awards are in largely different amounts, the amount of damages awarded does not alter the legal concept of a "prevailing party."  Furthermore, even if the court were to find that Target "prevailed" to a degree greater than Landon, it has not found that Landon was more culpable than Target, and will not award attorney's fees in this scenario.

Finally, the court has determined that the equities of the circumstances dictate against an award of attorney fees.  This decision is in large part because it is the court's opinion that both sides in this dispute performed their core obligations under the contract with a good faith effort.  Their differences were the result of genuine disagreement, and each side had some merit to their complaints.  Unfortunately, the parties' differences blossomed into very expensive litigation that only caused their positions to become more rigid.  To the extent that this court enjoys discretion in determining this claim, the court, therefore, concludes each party should pay its own attorney fees.

IV.  Conclusion

22

For the reasons, and to the extent, stated above, judgment will enter for both Landon and Target on their breach of contract claims, and for Target on its unjust enrichment claim.    Damages are awarded in the amounts set forth above.


s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2005


CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on September 30, 2005, by electronic and/or ordinary mail.


s/Josephine Chaffee
Secretary/Deputy Clerk